## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| MTHREE CORPORATE CONSULTING LIMITED D/B/A WILEY EDGE, <br><br> Plaintiff, <br><br> v. <br><br> CHRISTOPHER WASCAK and ROBERT ROLLE, <br><br> Defendants. | Civil Action No. <br><br> **VERIFIED COMPLAINT WITH JURY DEMAND** |

MThree Corporate Consulting Ltd. ("MThree"), now doing business as Wiley Edge ("Wiley Edge" or the "Company"), by and through its undersigned counsel, files this Verified Complaint against defendants Christopher Wascak and Robert Rolle ("Defendants"), and in support thereof states as follows:

### I.      Nature of Action

1.   This is an action for preliminary and permanent injunctive relief to prevent Defendants, former Wiley Edge senior leaders who possess vast and detailed knowledge of the Company's most competitively sensitive and propriety information and trade secrets, from violating their non-compete and non-solicitation obligations and from inevitably using the Company's trade secrets for the benefit of a competitive entity they formed before even leaving the Company.

### II.      Parties

1.      Wiley Edge is a Delaware company with its principal place of business at 111 River Street, Hoboken, New Jersey 07030.

2.      Christopher Wascak is an individual residing in Florida.

3.      Robert Rolle is an individual residing in North Carolina.

4.      This Court has diversity jurisdiction over this action pursuant to 28 USC 1332 because the value of the amount in controversy exceeds $75,000, exclusive of attorneys' fees, costs, and interest, and Wiley Edge, Mr. Wascak and Mr. Rolle are citizens of different states (New Jersey, Florida, and North Carolina).  This Court also has federal question jurisdiction over this action based on the cause of action asserted under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. 1831 et seq.

5.      Personal jurisdiction exists over Mr. Wascak and Mr. Rolle in New York because each executed an agreement containing a venue and governing law provision, which provides that any proceeding concerning the enforcement of the Agreement, including an entry of a temporary and/or permanent restraining order shall be brought in the United States District Court for the Southern District of New York or in the Supreme Court of the state of New York, New York County, and both consented to personal jurisdiction therein.

6.      Venue is proper in this district pursuant to 28 USC 1391(a)(3).

### III.      Facts Common to All Counts

#### A. The Company and the Hire, Train, Deploy Alumni Program

7.      MThree was a New York-based education/staffing services provider that operates in a number of sectors, including financial services, production support, business analysis, cyber and information security, and application development.

8.      In 2016, MThree was becoming significantly invested in the hire, train deploy business model through its Alumni Program.

9.      The hire, train, and deploy business model is a hybrid educational and staffing model through which the Company identifies talented individuals coming out of colleges or

- 2 -

universities (the "Alumni"), hires them directly, provides practical training geared towards specific technical jobs that the Alumni do not receive through formal education, prepares them to meet the skill needs of today's tech careers, and then places them with some of the world's largest financial institutions, technology companies, and government agencies (the Company's clients).

10.     The success of the Alumni Program is dependent, in part, on: a) the signing on of potential clients to place the Alumni; b) employing a successful curriculum to train the Alumni; and c) identifying and recruiting talented Alumni.

11.     Through the Alumni Program, selected graduates, who pass an entrance exam to test core competencies, are placed through a rigorous training for a specific placement and induction period within a client, in order to enable them to hit the ground running upon joining one of the Company's clients.  During the placement period, the Company collects fees from the clients to, among other things, cover the costs associated with the Company's employment and training of the placed Alumni.  After a twelve-to-twenty-four-month placement period, the client has the option of hiring the placed Alumni as a full-time employee.

12.     While the clients and Alumni are critical components of the Alumni Program, what makes the program successful and attractive to both clients and Alumni is the Company's curriculum.  The curriculum, which is the product of years of hard work and required the expenditure of significant resources, marries formal education created by professors and other educators with real-world, on-the-job experience provided by actual software engineers.

13.     While there are certain core aspects to the curriculum, the curriculum for a specific placement takes into account specific needs of the client for whom the placement is being made and, thus, the curriculum changes based on the particular clients' needs.  It is not a standard or generic program but is specific to the job that the Alumni is going to ultimately perform within the

ACTIVE 681563499v2

clients' business.

14.     The curriculum for each client is the product of years of effort and significant expense and constitutes confidential trade secret information.

15.     The curriculum is maintained in a secure environment with access to it limited only to those in the Company that need it.  While the clients are generally informed about the curriculum, they do not get copies of the curriculum and are unaware of how it has been developed. In addition, while the curriculum is used to train the Alumni, they do not get to maintain copies of the curriculum and are only provided access to the training modules after they execute a confidentiality agreement.

16.     The Company has developed clients worldwide and therefore provides Alumni with opportunities across the North America, United Kingdom, Europe, Asia, and Australia.

**B.   Mr. Wascak – Head of Global Business Development**

17.     On or about February 21, 2019, Christopher Wascak was hired by the Company as the Director – Head of Business Development, North America, and was based in New York City. On or about February 25, 2019, Mr. Wascak executed an Employment Offer Letter and Confidentiality, Restrictive Covenant and Inventions Agreement (the "Wascak Agreement"). A true and correct copy of the Wascak Agreement is attached hereto as Exhibit A.

18.     Pursuant to the Wascak Agreement, Mr. Wascak agreed that, during his employment, including the applicable 90-day notice period, and for a period of six (6) months after termination of his employment with the Company, he is prohibited from competing with the Company, taking steps in anticipation of competing with the Company or engaging in any Interfering Activities for a period of twelve (12) months from such date of termination.  *See id.*, at Section C.

19.     In his role as Head of Business Development, North America, and as more fully described below, Mr. Wascak was responsible for all new business in North America, as well as developing the sales training program, and overseeing the work of the Company's North American Sales team.

20.     Mr. Wascak was personally responsible for identifying the employment and training needs of all potential clients in North America, negotiating and finalizing all contracts with all North American clients, as well as overseeing the initial deployment of staff into a North American client's business.

21.     Mr. Wascak was directly involved in crafting and creating the curriculum and heavily influenced how it was developed.  Specifically, he worked closely with the subject matter experts (i.e., individuals who actually know what particular skills are needed for the particular job), liaised with the client to understand the client's specific needs, and would then relay this information to those at the Company responsible for crafting the curriculum for a particular client.

22.     In January 2020, John Wiley & Sons, Inc. ("Wiley"), a global leader in research and education, acquired MThree.  At the time of the acquisition, Mr. Wascak's title was Director – Head of Business Development, North America, and Mr. Rolle's title was Director - Global Inside Sales.

23.     As the company grew, and Mr. Wascak's remit expanded globally, on or about November 1, 2021, Mr. Wascak was promoted to Senior Director and was responsible for leading all of Global Business Development.  In his capacity as Senior Director, Business Development, Mr. Wascak's responsibilities remained largely the same, but his scope was expanded beyond North America and he assumed responsibility for all of the Company's clients globally.  To that end, Mr. Wascak was directly responsible for developing and implementing the training of the

Company's global salesforce, identifying the staffing and training needs of potential clients, negotiating and securing the execution of MSAs with clients and, for a time, overseeing the initial placement of the Company's Alumni onsite at the Company's clients' locations.

24.    In order to sign on a new client, the Company typically has to respond to and win a Request for Proposal ("RFP").  During his tenure with the Company, Mr. Wascak was directly responsible for: a) the delivery of hundreds of client pitches; b) every RFP the Company responded to; and c) winning RFPs and engagements for many of the Company's biggest clients.

25.    Using the Company's resources, Mr. Wascak created the induction deck for his sales team, which included the confidential information on how to successfully sell the Company's model to prospective clients.

26.    Mr. Wascak was responsible for hundreds of full pitches and presentations, and therefore had full knowledge of the Company's pipeline of prospective clients and potential opportunities - some of which are incredibly non-obvious.

27.    Mr. Wascak had visibility and direct input on the Company's entire pricing strategy and has intimate knowledge on how the Company successfully positioned itself to win pitches and RFPs from a financial and market differentiation perspective. Mr. Wascak also has direct knowledge about how much the Company pays and structures the pay for each of its employees and trainees globally, and thus, he would know how to undercut the Company when competing for an RFP.

28.    Mr. Wascak was also directly involved in the negotiation of a Master Service Agreement ("MSA") with potential clients, and he was often the one driving the terms of the agreements.  Mr. Wascak made relationships with the key decision makers within the clients and the clients' legal team and would liaise with the Company's own legal team on contract negotiation

- 6 -

and other issues.  As such, Mr. Wascak has intimate knowledge about how the Company structures and negotiates its MSAs.

29.    In addition, Mr. Wascak had access to all of the sales teams' SharePoint's, including the sales decks, presentations, and other such information that the Company considers proprietary and confidential.

30.    Mr. Wascak participated in many internal strategic conversations and meetings particularly over the last 18-24 months, with upper management to strategize on business expansion and discuss how to best position the Company given the current market demands, including a recent business initiative relating to minority and underserved communities. Indeed, Mr. Wascak was integral in developing the Company's strategy to leverage its ability to identify, hire, train and deploy minority candidates to help clients satisfy minority hiring initiatives.

31.    Because Mr. Wascak's compensation was based on a percentage of revenue that came from the contracts he signed on for the Company, he was incentivized to sign on as many Alumni to join the Alumni Program as possible. He worked closely with the talent acquisition team, who was responsible for recruiting Alumni to join the Alumni Program.  Mr. Wascak has knowledge of the Company's talent acquisition team's strategies and techniques in trying to persuade and attract candidates to join the Alumni Program.

32.    Prior to October 2021, Mr. Wascak was also in charge of running the first "pilot program" with each new client that he signed on.

33.    The pilot program would run after the curriculum was created and agreed upon with the client.

34.    The pilot program served as a smaller-scale program for new clients in that it would involve a fewer number of alumni but lasts the same amount of time as a regular engagement.  The

purpose of the pilot program was so that the client could make any necessary adjustments to the curriculum before running a regular engagement, with a larger group of alumni.

35.     Part of Mr. Wascak's responsibility in running the pilot program would be to engage in a back-and-forth dialogue with the client to implement any adjustments and business insights to the curriculum that the client requested.

36.     Starting in October 2021, the Client Services Management team took over the responsibility for running the pilot programs.  However, Mr. Wascak remained involved in the process, since he was still incentivized to sign on a large number of alumni because his compensation was based on a percentage of revenue that came from the contracts he signed on for the Company.

37.     On or about September 2020 and December 2021, Mr. Wascak executed Restricted Share Unit Grant Agreements (the "RSU Grant Awards").  True and correct copies of the RSU Grant Awards are attached hereto as Exhibit B.

38.     Pursuant to the RSU Grant Awards, Mr. Wascak agreed that, during his employment with the Company and for a period of one (1) year thereafter, he shall not (i) induce or attempt to induce any employee of the Company to leave the employ of the Company or otherwise interfere with the relationship between the Company and any employee, (ii) hire any person who was an employee of the Company at any time during the last twelve months, or (iii) induce or attempt to induce any customer, supplier, licensee, licensor, franchisee or other business relation of the Company or any affiliate to cease doing business with the Company.  *See id.* at Section 4(b).

39.     Pursuant to the RSU Grant Awards, Mr. Wascak agreed and acknowledged that certain forfeiture provisions will apply if he engages in an act that violates Section 4(a) and/or (b)

of the RSU Grant Awards.  *See id.* at Section 4(c).

### C. <u>Robert Rolle – Head of Global Inside Sales</u>

40.     On or about January 8, 2020, Robert Rolle was hired by the Company as Business Development Director and would perform his duties remotely from North Carolina, with regular travel to the Company's principal North American office in New York City.  On or about January 8, 2020, Mr. Rolle executed his Offer Letter and Terms and Conditions (the "Rolle Agreement") with Wiley Edge.  A true and correct copy of the Rolle Agreement is attached hereto as Exhibit C.

41.     Pursuant to the Rolle Agreement, Mr. Rolle agreed that, during his employment, including the applicable 30-day notice period, and for a period of six (6) months after termination of his employment with the Company, he is prohibited from competing with the Company, taking steps in anticipation of competing with the Company or engaging in any Interfering Activities for a period of twelve (12) months from such date of termination.  *See id.*, at Section C.

42.     Mr. Rolle reported to Mr. Wascak. In his role as Business Development Director, and as more fully described below, Mr. Rolle was responsible for the initial outreach to potential clients.

43.     In or about early 2021, the Company restructured its sales model to add an inside sales team.  Prior to this restructuring, there was only a business development team and client services team.  This change in structure was a strategic change that the Company believed would give them a competitive advantage over others in the industry, who do not employ an inside sales team, by generating additional hot leads for clients.  Mr. Wascak and Mr. Rolle were directly involved in the strategic discussions that ultimately led to the creation of the inside sales team.

44.     In addition, Mr. Rolle was promoted to the role of Head of Global Inside Sales and was given responsibility for building the inside sales team and the confidential and proprietary

scripts, templates, forms and training materials used by the four to five employees on the inside sales team.  Those materials incorporate key components of the Company's business model and key factors setting the Company apart from their competition in order to garner interest from potential clients.

45.     After building the team and developing the team's sales materials, Mr. Rolle supervised the team's outreach campaign which sought to target potential clients and key contacts within potential clients' organizations, which information was procured through business intelligence providers with whom the Company maintains relationships.

46.     In his role, Mr. Rolle learned all of the key relationships with the Company's major clients and potential clients and gained knowledge and insight into the strategies that allow the Company to succeed in differentiating itself from competitors.

47.     While some of the Company's largest clients are typically well-known financial institutions, understanding who the key personnel are within the client's architecture and what the clients staffing and training needs are is not well-known.  To the contrary, that is information that the Company has developed over time and through the expenditure of significant resources.

48.     Under the Company's new sales structure, once a potential client responds to Mr. Rolle's outreach campaign with an interest, Mr. Wascak and his team would take over to close the deal and sign on the client.

49.     While the COVID 19 Pandemic caused some business interruption, since putting the new structure in place, the Company has greatly increased its revenue, client base and grown its provision of services to existing clients.

50.     Moreover, through the help of Wiley and its portfolio of companies, the Alumni during the Covid 19 Pandemic, the Company was able to seamlessly pivot its Alumni Program

from an in-person to a virtual model, a process that Mr. Wascak and Mr. Rolle were able to take advantage of in selling the Company's services and establishing relationships with clients.

51.     In or around May 2022, MThree was renamed Wiley Edge.

**D.  <u>Wascak and Rolle Resign to Unlawfully Compete</u>**

52.     Without warning, Mr. Wascak submitted his letter of resignation on or about June 1, 2022 (attached hereto as Exhibit D), and Mr. Rolle, subsequently, submitted his letter of resignation on or about June 27, 2022 (attached hereto as Exhibit E).

53.     On June 15, 2022 and June 30, 2022, the Company accepted Wascak and Rolle's resignation and reminded them of their ongoing obligations.  True and correct copies of the June 15 and June 30 letters are attached hereto as Exhibit F & G.

54.     Mr. Wascak's letter of resignation recognized the ninety (90) day notice of termination requirement that he agreed to in his employment agreement and, thus, indicated his resignation was effective as of August 31, 2022.  *See* Ex. D.

55.     Subsequently, however, Mr. Wascak, without any legal or contractual authority to do so, sought to unilaterally shorten his garden leave period and make his resignation effective July 19, 2022.  A true and correct copy of Mr. Wascak's email dated July 19, attempting to unilaterally shorten his garden leave, is attached hereto as Exhibit H.

56.     The Company did not accept Mr. Wascak's unilateral attempt to shorten his garden leave period. By email dated July 20, the Company reminded Mr. Wascak that he is on garden leave through August 31 and remains an employee of the Company until that date. *See id.* The Company also again reminded Mr. Wascak of his fiduciary duties and other obligations to the Company, including the restrictive covenants contained in the Wascak Agreement. *Id.* Mr. Wascak remains an employee of the Company to date.

- 11 -

57.     Mr. Rolle's resignation letter recognized the thirty (30) day notice of termination requirement that he agreed to and, thus, Mr. Rolle remained employed by the Company through July 26, 2022.  *See* Ex. E.

58.     Like Mr. Wascak, Mr. Rolle, without any legal or contractual authority to do so, sought to unilaterally shorten his garden leave period and make his resignation effective July 19, 2022 (the same day as Mr. Wascak's). A true and correct copy of Mr. Rolle's email dated July 19, attempting to unilaterally shorten his garden leave (and which contains identical language to the email sent by Mr. Wascak on the same date), is attached hereto as Exhibit I.

59.     The Company did not accept Mr. Rolle's unilateral attempt to shorten his garden leave period.  *See id.* By email dated July 20, the Company reminded Mr. Rolle that he is on garden leave through July 26 and remains an employee of the Company until that date. *See id.* The Company also again reminded Mr. Rolle of his fiduciary duties and other obligations to the Company, including the restrictive covenants contained in the Rolle Agreement. *Id.*

60.     In response to the July 20 emails to Mr. Wascak and Mr. Rolle, both Mr. Wascak and Mr. Rolle sent identical emails dated July 22, again attempting to unilaterally shorten their garden leave period. It also appears that both Mr. Wascak and Mr. Rolle even changed their bank accounts so that the Company could not continue to pay them. *See* Exs. H & I.

61.     On or about August 1, 2022, the Company first became aware that Mr. Wascak and Mr. Rolle had formed a company in North Carolina for the express purpose of competing against Wiley Edge in the hire, train, deploy business.  Indeed, they named their new business HTD Talent.

62.     Through a July 29, 2022 press release, a copy of which is attached hereto as Exhibit N, the Company learned that HTD Talent was incorporated on July 28, 2022 and, just over a month after Mr. Rolle resigned, had already brought in an initial investment of five million dollars.

- 12 -

63.     By letters dated August 5, 2022, and August 8, 2022, true and correct copies of which are attached hereto as Exhibits J & K, the Company put Mr. Wascak and Mr. Rolle on written notice that they must comply with their non-compete, non-solicitation, confidentiality and other obligations to the Company, and demanded that Mr. Wascak and Mr. Rolle immediately cease and desist any unlawful activities.

64.     By letter dated August 11, 2022, a copy of which is attached hereto as Exhibit L, Robert Ottinger, Esq., counsel retained by Mr. Wascak and Mr. Rolle, responded that the Company's cease and desist demand was unwarranted and denied that Mr. Wascak or Mr. Rolle were in breach of their contractual obligations to the Company. Mr. Wascak and Mr. Rolle took the position that the restrictive covenants are unenforceable.

65.     By letter dated August 16, 2022, a copy of which is attached hereto as Exhibit M, counsel for the Company responded to Mr. Ottinger's August 11 letter, providing Mr. Wascak and Mr. Rolle a final opportunity to confirm by the close of business on August 18, that they will fully comply with their restrictive covenants.

66.     On August 19, Mr. Ottinger emailed the Company's outside counsel acknowledging receipt of the August 16 letter and asked to set up a phone call. On the same day, the Company's outside counsel responded to Mr. Ottinger's email, advising that the Company is prepared to have a discussion on Monday morning regarding how Mr. Wascak and Mr. Rolle intend to comply with their post-employment obligations. Mr. Ottinger then responded, "We can't commit to that."

67.     As a result of performing their job duties at the Company, and as described above, both Mr. Wascak and Mr. Rolle became intimately familiar with – and in many instances, helped create for the Company – confidential, proprietary and trade secret information, including but not

limited to: business development plans, information about the Company's clients and prospective clients, price structures, terms of the Company's agreements with its clients, Company's negotiating strategies, and other strategies for competing in the industry.

68.     Additionally, using the insight, time and resources of the Company, Mr. Wascak and Mr. Rolle developed key relationships with decision makers within the Company's clients and potential clients.

69.     HTD is a direct competitor of the Company and, based on my quick review of the HTD website alone, it is clear that Mr. Wascak and Mr. Rolle have created and will be running this company using the confidential, proprietary and trade secret information they obtained while employed at Wiley Edge.

70.     Mr. Wascak and Mr. Rolle have even made diversity the focus of their company -- which, as Mr. Wascak and Mr. Rolle know, has been a major focus for Wiley Edge.

71.     HTD will be competing for the same RFPs as Wiley Edge.

72.     The enforcement of Mr. Wascak's and Mr. Rolle's restrictive covenants is necessary to prevent key employees like Mr. Wascak and Mr. Rolle from taking and deploying highly confidential and trade secret information, obtained solely by virtue of their employment with the Company, and gaining an unfair advantage.

## IV. CAUSES OF ACTION

### COUNT I
**Injunctive Relief**

73.     Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

74.     The Wascak and Rolle Agreements are valid and binding contracts between the Company and Mr. Wascak and Mr. Rolle, respectively.

- 14 -

75.    The RSU Grant Awards are binding contracts between the Company and Mr. Wascak.

76.    The Wascak and Rolle Agreements restrict Mr. Wascak and Mr. Rolle, during their employment, including the applicable 90-day notice period, and for a period of six (6) months after termination of his employment with the Company, from competing with the Company in the New York Metropolitan Area or within 50 miles therefrom, taking steps in anticipation of competing with the Company or engaging in any Interfering Activities for a period of twelve (12) months from such date of termination.

77.    The RSU Grant Awards restrict Mr. Wascak, during his employment with the Company and for a period of one (1) year thereafter, from soliciting or attempting to solicit any employee, customer, supplier, licensee, licensor, franchisee or other business relation of the Company.

78.    These limitation periods are extended by periods of violation or periods required for enforcing Mr. Wascak's and Mr. Rolle's post-employment covenants.

79.    The Restrictive Covenants contained in the Wascak and Rolle Agreements and the RSU Grant Awards are reasonably necessary, narrowly tailored, and no greater than necessary to protect the Company's legitimate and protectable business interests.

80.    Absent the restrictions contained in the Restrictive Covenants, the Company cannot adequately protect its legitimate interests in its Confidential Information, trade secrets, goodwill, client relationships, and other business assets.

81.    As set forth herein, Mr. Wascak and Mr. Rolle have breached the Agreements by, among other things, failing to abide by the Restrictive Covenants.

82.    If Mr. Wascak and Mr. Rolle are allowed to continue operating HTD Talent, a direct

*ACTIVE 681563499v2*

competitor of the Company, they will inevitably disclose the Company's Confidential Information when developing business and business strategies for HTD Talent.

83.     A presumption of irreparable harm exists where a former employee breaches a non-compete, non-solicitation, or confidentiality/non-disclosure covenant, and when confidential information or trade secrets are at stake.

84.     Pursuant to the Wascak and Rolle Agreements, the Company is entitled to "injunctive relief, without posting bond or other security" for any breach or threatened breach of the agreements.

85.     As a direct and proximate result of Mr. Wascak's and Mr. Rolle's breaches, the Company has suffered and will continue to suffer irreparable harm that cannot adequately be compensated by monetary damages.

86.     Plaintiff is also entitled to recover its attorneys' fees and costs incurred in enforcing its rights under the Wascak and Rolle Agreements.

## COUNT II
### Breach of Contract

87.     Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

88.     The Wascak Agreement and Rolle Agreement are valid and binding contracts between the Company and Mr. Wascak and Mr. Rolle, respectively.

89.     As set forth herein, Mr. Wascak and Mr. Rolle breached the Wascak and Rolle Agreements by, among other things, failing to abide by the restrictive covenant provisions and other obligations to the Company.

90.     The Company performed all of its obligations under the Wascak Agreement and Rolle Agreement.

*ACTIVE 681563499v2*

91.     As a direct and proximate result of Defendants' breaches, Plaintiff has suffered actual damages in an amount to be proven at trial.

92.     Plaintiff is also entitled to recover its attorneys' fees and costs incurred in enforcing its rights under the Wascak and Rolle Agreements.

## COUNT III
## Breach of Contract Against Mr. Wascak

93.     Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

94.      The RSU Grant Awards are valid and binding contracts between the Company and Mr. Wascak.

95.     As set forth herein, Mr. Wascak breached the RSU Grant Awards by, among other things, failing to abide by the restrictive covenant provisions and other obligations to the Company.

96.     The Company performed all of its obligations under the RSU Grant Awards.

97.     As a direct and proximate result of Defendants' breaches, Plaintiff has suffered actual damages in an amount to be proven at trial.

98.     Plaintiff is also entitled to recover its attorneys' fees and costs incurred in enforcing its rights under the Wascak and Rolle Agreements.

## COUNT IV
## Breach of the Duty of Loyalty/Faithless Servant Doctrine

99.     Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

100.     In accordance with the parties' agreements, and other relative statutory and common law, Mr. Wascak and Mr. Rolle each had a fiduciary duty to at all times exercise the utmost good faith and loyalty in the performance of their duties to the Company.

- 17 -

101.    Mr. Wascak and Mr. Rolle violated their fiduciary obligations to the Company by, among other things: resigning and unilaterally attempting to shorten their garden leave period; planning to form and actually forming a direct competitor while still employed at the Company; and misappropriating the Company's confidential information and trade secrets.

102.    Mr. Wacak and Mr. Rolle are faithless servants and should be ordered to forfeit the compensation earned during the period of their disloyalty.

<div align="center">

**COUNT V**
**Misappropriation of Trade Secrets and Confidential Information**

</div>

103.    Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

104.    The Defend Trade Secrets Act ("DTSA"), 18 U.S.C. 1831 et seq., state-law Uniform Trade Secrets Act, and/or common law prohibit the unauthorized acquisition, disclosure, use, conversion, and misappropriation of trade secrets and authorize injunctions based on actual or threatened misappropriation.

105.    Plaintiff has a legitimate interest in the protection of its confidential information and trade secrets, which include: the curriculum; the induction deck and other confidential sales material; the Company's pipeline of prospective clients; key relationships with the Company's major clients and potential clients; pricing strategy; and structure and negotiation of MSAs.

106.    The aforementioned information are not generally known to, and are not readily ascertainable by proper means by, competitors or the general public, and are extremely valuable to the Company in that it provides competitive advantages over the Company's competitors.

107.    The Company  has made reasonable and diligent efforts to maintain and protect its trade secrets including by storing them in secure, password-protected databases and programs and on secure servers; requiring personalized passwords and/or two-factor authentication; limiting

<div align="center">- 18 -</div>

distribution or access rights to persons obligated to maintain the confidentiality and only to the extent necessary to perform their jobs; and explicitly marking certain documents and information "confidential," "trade secret," and "proprietary."

108.    By contract and under common law, Defendants have a duty not to disclose or use any proprietary or confidential information belonging to the Company.

109.    Defendants misappropriated the Company's trade secrets by forming HTD Talent, a direct competitor, and which, on information and belief, Mr. Wascak and Mr. Rolle will be running using the confidential, proprietary and trade secret information they obtained while employed at the Company.

110.    The timing, facts, and other circumstances surrounding Defendants' conduct shows it was intentional, deliberate, willful, malicious, and in bad faith.

111.    Defendants have continued to disclose, use, and furnish Plaintiff's trade secrets to and for the benefit of Defendants to enable them to unlawfully and unfairly compete.

112.    As a direct and proximate result of Defendants' actual and threatened misappropriation, Plaintiff has and will continue to suffer irreparable harm and as a result of losing existing and potential clients, candidates, associates, colleagues, business opportunities, suppliers, competitive advantages, trade secrets, Confidential Information, goodwill, and other assets, as well as damages and other harm.

## COUNT VI
### Declaratory Judgment

113.    Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

114.    The Federal Declaratory Judgment Act authorizes courts to declare rights, status, and other legal relations under a contract to afford litigants relief from uncertainty and insecurity.

*ACTIVE 681563499v2*

115.    Under the Declaratory Judgment Act, a declaratory judgment is appropriate where the judgment will terminate the controversy or remove an uncertainty.

116.    A justiciable controversy exists between Plaintiff and Defendants in which Plaintiff has an interest.

117.    Plaintiff has been damaged by Defendants' conduct and seeks the entry of a declaratory judgment, adjudging and declaring that: (i) Defendants are required to fully and completely comply with Wascak and Rolle Agreements, including specifically the Restrictive Covenants contained in Section C; and (ii) Mr. Wascak is required to fully and completely comply with the RSU Grand Awards, including specifically the Restrictive Covenants contained therein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court:

a)  Enter judgment against Defendants and in favor of Plaintiff;

b)  Issue a preliminary and permanent injunction prohibiting Mr. Wascak and Mr. Rolle from operating HTD Talent in breach of the Wascak and Rolle Agreements for the twelve-month period following their respective resignations from the Company or otherwise sufficient to provide the Company with the full benefit of the protection of Section C of the Wascak and Rolle Agreements;

c)  Issue a preliminary and permanent injunction prohibiting Mr. Wascak and Mr. Rolle from breaching the terms of their respective agreements with the Company, including the non-solicitation provisions;

d)  Issue a preliminary and permanent injunction prohibiting Defendants from using, disclosing or misappropriating Company trade secret information;

e)  Award the Company its attorneys' fees, costs and disbursements incurred as a result of

- 20 -

this action;

f)  Award compensatory and punitive damages to Plaintiff, in amounts to be determined

at trial, for Defendants breach of contract and misappropriation of trade secrets; and

g)  Grant such other relief as the Court deems necessary and proper.


DATED:  August 22, 2022

<div style="margin-left:40%">

**GREENBERG TRAURIG, LLP**

*s/ Jason H. Kislin*
Jason H. Kislin
kislinj@gtlaw.com
One Vanderbilt Avenue
New York, NY 10017
212.801.9200
212.801.6400 – Fax
*Attorneys for Plaintiff*

</div>

*ACTIVE 681563499v2*

## **VERIFICATION**

THOMAS SEYMOUR, being duly sworn, on oath, deposes and states as follows:

I am the Senior Director of Human Resources at Wiley Edge, the Plaintiff in this action.  I have read the foregoing Verified Answer and Affirmative Defenses and know the contents thereof to be true, except for those allegations made on information and belief, and for those I know them to be true to the best of my knowledge.  The grounds for my belief as to all of the foregoing are my personal knowledge and my review of relevant documents.

Dated:  August 22, 2022


*Thomas Seymour*
_____
Thomas Seymour

*ACTIVE 681563499v2*