# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

MTHREE CORPORATE
CONSULTING LIMITED D/B/A
WILEY EDGE,

        Plaintiff,

    v.

CHRISTOPHER WASCAK and ROBERT
ROLLE,

        Defendants.

Civil Action No.   1:22-cv-07158

---

## MEMORANDUM OF LAW IN SUPPORT OF ORDER TO SHOW CAUSE WITH TEMPORARY RESTRAINTS

---

GREENBERG TRAURIG
Jason H. Kislin, Esq.
Clarissa A. Gomez, Esq.
kislinj@gtlaw.com
One Vanderbilt Avenue
New York, NY 10017

*Attorneys for Plaintiff Wiley Edge*

# TABLE OF CONTENTS

Preliminary Statement.................................................................................................... 1

Statement of Relevant Facts........................................................................................... 4

    A.  The Company and the Hire, Train, Deploy Alumni Program........................... 4

    B.  Mr. Wascak – Head of Global Business Development..................................... 6

    C.  Robert Rolle – Head of Global Inside Sales ................................................. 11

    D.  Wascak and Rolle Resign to Unlawfully Complete ...................................... 13

LEGAL ARGUMENT..................................................................................................... 16

    I.       Plaintiff Is Entitled To Injunctive Relief and Temporary Restraints.......................... 16

          A.  Injunctive Relief is Necessary to Prevent Immediate and Irreparable Harm........ 17

          B.  Plaintiff is Likely to Prevail on Its Claims............................................................ 22

              1.   Plaintiff Will Succeed on its Breach of Contract Claim Because The Restrictive Covenants are Enforceable ......................................................... 22

                  a.   The Restrictive Covenants are Reasonable as to Time and Geographical Scope................................................................................ 23

                  b.   The Restrictive Covenants Are Required to Protect the Company's Legitimate Interests........................................................................ 25

                  c.   The Restrictive Covenants Do Not Impose An Undue Hardship on Defendants ........................................................................................... 29

                  d.   The Restrictive Covenants Are Not Against The Public Interest ............ 30

                  e.   Defendants Breached the Enforceable Restricted Covenants.................. 31

          C.  The Balance of Hardships Favor a Temporary Restraining Order and Injunction .................................................................................................. 32

CONCLUSION................................................................................................................ 32

i

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Adecco USA, Inc. v. Staffworks, Inc.*,
2020 U.S. Dist. LEXIS 226382 (N.D.N.Y. Sept. 15, 2020) ......................................21, 22, 23

*Allstate Ins. Co. v. Harvey Family Chiropractic*,
677 Fed. Appx. 716 (2d Cir. 2017)................................................................................17

*Deutsche Mex. Holdings S.a.r.l. v. Accendo Banco, S.A.*,
2019 U.S. Dist. LEXIS 180275 (S.D.N.Y. Oct. 17, 2019) ......................................22

*Ecolab, Inc. v. K.P. Laundry Machinery, Inc.*,
656 F.Supp. 894 (S.D.N.Y. 1987)......................................................26, 29, 30, 32

*Estee Lauder Cos. v. Batra*,
430 F.Supp.2d 158 (S.D.N.Y. 2006)................................................................ *passim*

*Evolution Markets, Inc. v. Penny*,
23 Misc.3d 1131 (2009).........................................................................23, 24

*Goodman v. New York Oncology Hematology, P.C.*,
101 A.D.3d 1524 (3d Dep't 2012).................................................................23

*Integra Optics, Inc. v. Messina*,
52 Misc.3d 1210(A), 41 N.Y.S.3d 719 (2016) ..............................................23, 24

*Johnson Controls, Inc. v. A.P.T. Critical Sys.*,
323 F.Supp.2d 525 (S.D.N.Y. 2004)................................................................21

*Local 1814, Int'l Longshoremen's Ass'n v. N.Y. Shipping Ass'n, Inc.*,
965 F.2d 1224 (2d Cir. 1992)...........................................................................16

*Markovits v. Venture Info Capital, Inc.*,
129 F.Supp.2d 647 (S.D.N.Y. 2001)................................................................22

*Marsh USA Inc. v. Karasaki*,
2008 U.S. Dist. LEXIS 90986 (S.D.N.Y. Oct. 31, 2008) ......................25, 26, 30, 32

*MasterCard International Inc. v. Nike Inc.*,
164 F.Supp.3d 592 (S.D.N.Y. 2016)................................................................24

*Mercer Health & Benefits LLC v. DiGregorio*,
307 F. Supp. 3d 326 (S.D.N.Y. 2018)..................................................17, 22, 29, 31

*Motorola Credit Corp. v. Uzan*,
    322 F.3d 130 (2d Cir. 2003).............................................................................16

*Payment Alliance Int'l, Inc. v. Ferreira*,
    530 F.Supp.2d 477 (S.D.N.Y. 2007)...........................................................17, 20

*Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*,
    813 F.Supp.2d 489 (S.D.N.Y. 2011).................................................................26

*Silipos, Inc. v. Bickel*,
    2006 WL 2265055 (S.D.N.Y. Aug. 8, 2006).....................................................24

*Softel, Inc. v. Dragon Med. & Scientific Commc'ns, Inc.*,
    118 F.3d 955 (2d Cir. 1997)..............................................................................26

*Ticor Title Ins. Co. v. Cohen*,
    173 F.3d 63 (2d Cir. 1999).........................................................................17, 24

*Uni-World Capital L.P. v. Preferred Fragrance, Inc.*,
    73 F.Supp.3d 209 (S.D.N.Y. 2014)..............................................................30, 32

*Unisource Worldwide, Inc. v. Valenti*,
    196 F.Supp.2d 269 (E.D.N.Y. 2002) .................................................................23

*Veramark Techs. Inc. v. Bouk*,
    10 F.Supp.3d 395 (W.D.N.Y. 2014).............................................................21, 22

*Washington Square Institute for Psychotherapy and Mental Health, Inc. v.*
    *Speciner*,
    259 A.D.2d 368 (1st Dep't 1999) .....................................................................23

## Other Authorities

Fed. R. Civ. P. 65..................................................................................................1, 5

*ACTIVE 681564144v1*

Plaintiff, MThree Corporate Consulting Limited ("MThree"), now doing business as Wiley Edge ("Wiley Edge" or the "Company"), through its undersigned counsel, submits this Memorandum of Law in Support of Plaintiff's Application for a Temporary Restraining Order and Preliminary Injunction against defendants Christopher Wascak and Robert Rolle pursuant to Fed. R. Civ. P. 65 seeking to preserve the status quo by ordering, among other things, that defendants fully comply with the obligations under their respective employment agreements with the Company.

## <u>Preliminary Statement</u>

This application seeks to prevent two senior-executive employees, Mr. Wascak - the Head of Global Business Development - and Mr. Rolle – the Head of Global Inside Sales – from violating restrictive covenants. Both Defendants created, maintained, and had access to confidential and proprietary information and Company trade secrets relating to, among other things, the Company's marketing efforts, clients and prospective clients and key components of the Company's business. Moreover, the restrictive covenants they agreed-to are *per se* reasonable under New York law. Indeed, the non-compete provision that both Defendants agreed to is limited to six months and, considering the international scope of the business at issue, an extremely reasonable geographic restriction of the New York Metropolitan area or within 50 miles therefrom. The non-solicitation provisions that both Defendants agreed to is limited to twelve months and prevents solicitation or hiring of Company employees, clients the Defendants originated or serviced, and prospective clients for whom Defendants had Confidential Information.

Without more, the restrictions at issue are clearly reasonable and enforceable -- but there is more, as this is not the typical case in which a disenfranchised employee leaves to join a competitor. Rather, Defendants here, each of whom was recently promoted – and one recently

*ACTIVE 681564144v1*

awarded with an equity grant agreement containing its own additional non-solicitation provisions – voluntarily resigned to create a brand-new, direct competitor of the Company.  Making matters worse, Mr. Wascak is still an employee of the Company, with his garden leave set to end on August 31, 2022, and Mr. Rolle's garden leave ended on July 26, 2022, just two days before Defendants incorporated and announced their new business.  In the press release for their new business, Defendants tout that they have already brought in a $5 million investment.  The only implication that can be drawn from this is that Defendants have been planning this act of disloyalty for months, while continuing to maintain their access to Company Confidential Information and continuing to take their compensation.  Finally, a review of Defendants' new website makes clear that they are not only competing but have taken on the very strategic direction the Company just deployed and that each were involved in crafting.

The Company is in a unique offshoot of the employee staffing business referred to in the industry as the hire, train, deploy model. In that regard, the Company: 1) identifies talented individuals, most of whom just recently graduated from a two-or four-year undergraduate degree program in computer or software engineering (the "Alumni"); 2) hires the Alumni directly after they pass a basic proficiency test; 3) trains the Alumni on the theoretical and practical aspects of specific jobs that the Company's clients are looking to fill; and 4) deploys its Alumni employees into positions within the Company's clients for 12 to 24 months, after which time the Company's clients can hire the Alumni directly. The key components of the Company's business are its ability to identify and attract talented Alumni, its ability to obtain and retain clients in need of staffing help and, perhaps most significant, the curriculum it uses to train the Alumni, which curriculum is specialized and tailored to the needs of the Company's clients.

Mr. Wascak was hired as Director - Head of Business Development, North America in

*ACTIVE 681564144v1*

2019, and in 2021 he was promoted to Senior Director, Business Development. As Senior Director of Business Development, Mr. Wascak was responsible for the Company's entire marketing and sales process, the creation of the Company's sales training materials, responding to requests for proposals ("RFPs") from potential clients and negotiating and obtaining execution of the Company's master services agreements ("MSAs"). In addition, as the first client contact, Mr. Wascak was also intimately involved in the process of tailoring the curriculum to the clients' needs and, until recently, Mr. Wascak was responsible for overseeing the first deployment of Alumni into a client's business (the "pilot").

Mr. Rolle was hired as Business Development Director on January 8, 2020 and was subsequently promoted to Head of Global Inside Sales. In fact, Mr. Rolle was selected to build the Company's inside sales team from the ground up. In doing so, Mr. Rolle created the team structure and also created all of the materials the team employed to generate hot leads for prospective clients. While some of the Company's clients are generally well-known financial institutions, the key personnel and decision makers within those clients, and the staffing and training needs of those clients, is not well known. To the contrary, that information is developed by the Company at significant cost and expense. And, many of the Company's clients are incredibly non-obvious.

The law in New York is clear that a company has a legitimate protectible interest in protecting its confidential information, trade secrets and the good-will associated with client relationships that employees create through the exercise of their responsibilities as employees. Mr. Wascak, as Senior Director of Business Development, was directly responsible for the pitching, negotiation and execution of every client MSA the Company executed in the past 18 to 24 months. Moreover, Mr. Wascak created relationships with all of the Company's clients through the negotiation of the MSAs and the creation of the specialized curriculum used for each client. Mr.

*ACTIVE 681564144v1*

Rolle, as Head of Global Inside Sales, is responsible for every hot-lead the Company has generated over the past 18 to 24 months.  It is beyond doubt that the Company has a legitimate interest in protecting the information and relationships these former employees created and maintained using the resources of the Company through the enforcement of the restrictive covenants at issue.

### Statement of Relevant Facts

### A.  The Company and the Hire, Train, Deploy Alumni Program

MThree was a New York-based education/staffing services provider that operates in a number of sectors, including financial services, production support, business analysis, cyber and information security, and application development. Affidavit of Thomas Seymour dated August 22, 2022 ("Seymour Aff."), ¶2.  In or around January 2016, MThree was becoming significantly invested in the hire, train deploy business model through its Alumni Program.  *Id.*, ¶4.  The hire, train, and deploy business model is a hybrid educational and staffing model through which the Company identifies talented individuals coming out of colleges or universities (the "Alumni"), hires them directly, provides practical training geared towards specific technical jobs that the Alumni do not receive through formal education, prepares them to meet the skill needs of today's tech careers, and then places them with some of the world's largest financial institutions, technology companies, and government agencies (the Company's clients).  *Id.*, ¶5.

The success of the Alumni Program is dependent, in part, on: a) the signing on of potential clients to place the Alumni; b) developing and employing a successful curriculum to train the Alumni; and c) identifying and recruiting talented Alumni. *Id.*, ¶6. Through the Alumni Program, selected graduates, who pass an entrance exam to test core competencies, are placed through a rigorous training for a specific placement and induction period within a client, in order to enable them to hit the ground running upon joining one of the Company's clients.  *Id.*, ¶7.  During the

*ACTIVE 681564144v1*

placement period, the Company collects fees from the clients to, among other things, cover the costs associated with the Company's employment and training of the placed Alumni.  After a twelve-to-twenty-four-month placement period, the client has the option of hiring the placed Alumni as a full-time employee.  *Id.*

While the clients and Alumni are critical components of the Alumni Program, what makes the program successful and attractive to both clients and Alumni is the Company's curriculum. *Id.*, ¶8.  The curriculum, which is the product of years of hard work and required the expenditure of significant resources, marries formal education created by professors and other educators with real-world, on-the-job experience provided by actual software engineers.  *Id.*

While there are certain core aspects to the curriculum, the curriculum for a specific placement takes into account specific needs of the client for whom the placement is being made and, thus, the curriculum changes based on the particular clients' needs as well as business insights obtained over time and testing.  *Id.*, ¶9.  It is not a standard or generic program but is specific to the job that the Alumni is going to ultimately perform within the clients' business. *Id.*  The curriculum for each client is the product of years of effort and significant expense and constitutes confidential trade secret information. *Id.*, ¶10.  The curriculum is maintained in a secure environment with access to it limited only to those in the Company that need it.  *Id.*, ¶11.  While the clients are generally informed about the curriculum, they do not get copies of the curriculum and are unaware of how it has been developed.  In addition, while the curriculum is used to train the Alumni, they do not get to maintain copies of the curriculum and are only provided access to the training modules after they execute a confidentiality agreement.  *Id.*

The Company has developed clients worldwide and therefore provides Alumni with opportunities across the North America, United Kingdom, Europe, Asia, and Australia.  *Id.*, ¶12.

5

**B. Mr. Wascak – Head of Global Business Development**

On or about February 21, 2019, Christopher Wascak was hired by the Company as the Director – Head of Business Development, North America, and was based in New York City. *Id.*, ¶13. On or about February 25, 2019, Mr. Wascak executed an Employment Offer Letter and Confidentiality, Restrictive Covenant and Inventions Agreement (the "Wascak Agreement"). See Exhibit A to the Seymour Aff. The Wascak Agreement contains the following non-compete and non-solicitation provisions:

1. Competition and Interfering Activities. During your employment with MThree (including any applicable notice period prior to any termination thereof), and for the applicable Restricted Period, you agree that you will neither compete with the Company nor engage in any Interfering Activities, nor will you take any steps in anticipation of competing with the Company or engaging in Interfering Activities. For purposes of this Agreement:

    (a) "Compete" or "Competing" means to, directly or indirectly, on your behalf or on behalf of any other person or entity, in any way, whether as an individual proprietor, partner, stockholder, officer, employee, consultant, agent, director, joint venturer, investor, or in any other capacity, own, operate, manage, control, engage in, participate in, invest in, permit your name to be used by, act as a consultant or advisor to, render services for (alone or in association with any person, firm, corporation, or business organization), or otherwise assist any person or entity that engages in or owns, invests in, operates, manages, controls, or is affiliated with any venture or enterprise that, ***in the New York Metropolitan Area or within 50 miles therefrom***, offers or plans to offer competing services with those offered by the Company.

    (b) "Interfering Activities" means to, directly or indirectly, on behalf of yourself or any other person or entity, in any way (i) solicit, induce, or encourage the resignation of any member, partner, employee, agent, or consultant of MThree (ii) solicit, induce or encourage any member, partner, employee, agent or consultant of MThree to join or perform services for anyone else, in any capacity, (iii) interfere in any way with the relationship between the Company and any of its respective members, partners, employees, agents, or consultants, (iv) hire or attempt to hire or reach any agreement (oral or written) with respect to the prospective hiring of any member, partner, employee, agent or consultant of the Company or any person or entity that was a member, partner, employee, agent, or consultant within the six (6) month period immediately preceding the hire or attempt to hire, (v) interfere, or attempt to interfere, with the relationship between the Company and any of its actual or prospective clients or customers, or (vi) solicit, or attempt to solicit, the business of, any actual or prospective client or customer of the Company. ***You further acknowledge that this section C.1(b)(vi) shall apply to clients or customers you originated or serviced***

6

> ***during your employment with MThree, or about whom you are aware of Confidential Information, but only where MThree continues to provide services in the geographical area where such client or customer does business. This restriction is meant to protect the Company from losing such clients or customers to you, who by virtue of your employment with MThree, maintained a relationship with the clients and customers, gained knowledge about them, and/or became familiar with the requirements of such clients and customers***.

(c)   "Restricted Period" means (i) with respect to your covenant not to compete, the period commencing on the termination of your employment for any reason and ending on the six (6) month anniversary of the date of such termination, and (iii) with respect to your covenant as to Interfering Activities, the period commencing on the termination of your employment for any reason and ending on the twelve (12) month anniversary of the date of such termination.

2.   <u>Tolling of Restricted Periods.</u>  If you shall violate any covenant contained herein with a stated duration, the duration of any such covenant so violated shall automatically be extended with respect to you for a period equal to the period during which you shall have been in violation of such covenant.

Ex. A, Wascak Agreement, at Section C (emphasis added).

In his role as Head of Business Development, North America, and as more fully described below, Mr. Wascak was responsible for all new business in North America, as well as developing the sales training program, and overseeing the work of the Company's North American Sales team. Seymour Aff., ¶15.  Mr. Wascak was personally responsible for identifying the employment and training needs of all potential clients in North America, negotiating and finalizing all contracts with all North American clients, as well as overseeing the initial deployment of staff into a North American client's business.  *Id.*, ¶16.

Mr. Wascak was directly involved in crafting and creating the curriculum and heavily influenced how it was developed.  *Id.*, ¶17.  Specifically, he worked closely with the subject matter experts (i.e., individuals who actually know what particular skills are needed for the particular job), liaised with the client to understand the client's specific needs, and would then relay this information to those at the Company responsible for crafting the curriculum for a particular client.

7

*Id.*

In January 2020, John Wiley & Sons, Inc. ("Wiley"), a global leader in research and education, acquired MThree.  At the time of the acquisition, Mr. Wascak's title was Director – Head of Business Development, North America, and Mr. Rolle's title was Director - Global Inside Sales.  *Id.*, ¶18.

As the Company grew, and Mr. Wascak's remit expanded globally, on or about November 1, 2020, Mr. Wascak was promoted to Senior Director –Business Development.  *Id.*, ¶20.  In his capacity as Senior Director of Business Development, Mr. Wascak's responsibilities remained largely the same but his scope was expanded beyond North America and he assumed responsibility for all of the Company's clients globally.  To that end, Mr. Wascak was directly responsible for developing and implementing the training of the Company's global salesforce, identifying the staffing and training needs of potential clients, negotiating and securing the execution of MSAs with clients and, for a time, overseeing the initial placement of the Company's Alumni onsite at the Company's clients' locations.  *Id.*  In order to sign on a new client, the Company typically has to respond to and win a Request for Proposal ("RFP").  *Id.*, ¶21.  During his tenure with the Company, Mr. Wascak was directly responsible for: a) the delivery of hundreds of client pitches; b) every RFP the Company responded to; and c) winning RFPs and engagements for many of the Company's biggest clients.  *Id.*

Using the Company's resources, Mr. Wascak created the induction deck for his sales team, which included the confidential information on how to successfully sell the Company's model to prospective clients.  *Id.*, ¶22.  Mr. Wascak was responsible for hundreds of full pitches and presentations, and therefore had full knowledge of the Company's pipeline of prospective clients and potential opportunities - some of which are incredibly non-obvious. *Id.*, ¶23.  Mr. Wascak had

*ACTIVE 681564144v1*

visibility and direct input on the Company's entire pricing strategy and has intimate knowledge on how the Company successfully positioned itself to win pitches and RFPs from a financial and market differentiation perspective.  *Id.*, ¶24.  Mr. Wascak also has direct knowledge about how much the Company pays and structures the pay for each of its employees and trainees globally, and thus, he would know how to undercut the Company when competing for an RFP.  *Id.*

Mr. Wascak was also directly involved in the negotiation of a Master Service Agreement ("MSA") with potential clients, and he was often the one driving the terms of the agreements.  *Id.*, ¶25.  Mr. Wascak made relationships with the key decision makers within the clients and the clients' legal team and would liaise with the Company's own legal team on contract negotiation and other issues.  As such, Mr. Wascak has intimate knowledge about how the Company structures and negotiates its MSAs.  *Id.*  In addition, Mr. Wascak had access to all of the sales teams' SharePoint's, including the sales decks, presentations, and other such information that the Company considers proprietary and confidential.  *Id.*, ¶26.

Mr. Wascak participated in many internal strategic conversations and meetings particularly over the last 18-24 months, with upper management to strategize on business expansion and discuss how to best position the Company given the current market demands, including a recent business initiative relating to minority and underserved communities.  *Id.*, ¶27.  Indeed, Mr. Wascak was integral in developing the Company's strategy to leverage its ability to identify, hire, train and deploy minority candidates to help clients satisfy minority hiring initiatives.  *Id.*

Because Mr. Wascak's compensation was based on a percentage of revenue that came from the contracts he signed on for the Company, he was incentivized to sign on as many Alumni to join the Alumni Program as possible.  *Id.*, ¶28.  He worked closely with the talent acquisition team, who was responsible for recruiting Alumni to join the Alumni Program.  *Id.*  Mr. Wascak has

*ACTIVE 681564144v1*

knowledge of the Company's talent acquisition team's strategies and techniques in trying to persuade and attract candidates to join the Alumni Program. *Id.*

Prior to October 2021, Mr. Wascak was also in charge of running the first "pilot program" with each new client that he signed on. *Id.*, ¶29. The pilot program would run after the curriculum was created and agreed upon with the client. *Id.*, ¶30. The pilot program served as a smaller-scale program for new clients in that it would involve a fewer number of alumni, but lasts the same amount of time as a regular engagement. *Id.*, ¶31. The purpose of the pilot program was so that the client could make any necessary adjustments to the curriculum before running a regular engagement, with a larger group of alumni. *Id.* Part of Mr. Wascak's responsibility in running the pilot program would be to engage in a back-and-forth dialogue with the client to implement any adjustments and business insights to the curriculum that the client requested. *Id.*, ¶32. Starting in October 2021, the Client Services Management team took over the responsibility for running the pilot programs. *Id.*, ¶33. However, Mr. Wascak remained involved in the process, since he was still incentivized to sign on a large number of alumni because his compensation was based on a percentage of revenue that came from the contracts he signed on for the Company. *Id.*

On or about September 2020 and December 2021, Mr. Wascak executed Restricted Share Unit Grant Agreements (the "RSU Grant Awards"). *See* Exhibit B to the Seymour Aff. Pursuant to the RSU Grant Awards, Mr. Wascak agreed that, during his employment with the Company and for a period of one (1) year thereafter, he shall not (i) induce or attempt to induce any employee of the Company to leave the employ of the Company or otherwise interfere with the relationship between the Company and any employee, (ii) hire any person who was an employee of the Company at any time during the last twelve months, or (iii) induce or attempt to induce any customer, supplier, licensee, licensor, franchisee or other business relation of the Company or any

10

affiliate to cease doing business with the Company.  *See id.* at Section 4(b). Pursuant to the RSU

Grant Awards, Mr. Wascak agreed and acknowledged that certain forfeiture provisions will apply

if he engages in an act that violates Section 4(a) and/or (b) of the RSU Grant Awards.  *See id.* at

Section 4(c).

### C.  <u>Robert Rolle – Head of Global Inside Sales</u>

On or about January 8, 2020, Robert Rolle was hired by the Company as Business

Development Director and would perform his duties remotely from North Carolina, with regular

travel to the Company's principal North American office in New York City.  Seymour Aff., ¶37.

On or about January 8, 2020, Mr. Rolle executed his Offer Letter and Terms and Conditions (the

"Rolle Agreement") with Wiley Edge.  *See* Exhibit C to the Seymour Aff.

As with Mr. Wascak and the Wascak Agreement, pursuant to the Rolle Agreement, Mr.

Rolle agreed that, during his employment, including the applicable 30-day notice period, and for

a period of six (6) months after termination of his employment with the Company, he is prohibited

from competing with the Company, taking steps in anticipation of competing with the Company

or engaging in any Interfering Activities for a period of twelve (12) months from such date of

termination.  *See id.*, at Section C.

Mr. Rolle reported to Mr. Wascak. In his role as Business Development Director, and as

more fully described below, Mr. Rolle was responsible for the initial outreach to potential clients.

Seymour Aff., ¶39.  In or about early 2021, the Company restructured its sales model to add an

inside sales team.  *Id.*, ¶40.  Prior to this restructuring, there was only a business development team

and client services team.  *Id.*  This change in structure was a strategic change that the Company

believed would give them a competitive advantage over others in the industry, who do not employ

an inside sales team, by generating additional hot leads for clients.  *Id.*  Mr. Wascak and Mr. Rolle

11

were directly involved in the strategic discussions that ultimately led to the creation of the inside sales team. *Id.* Under the Company's new sales structure, once a potential client responds to Mr. Rolle's outreach campaign with an interest, Mr. Wascak and his team would take over to close the deal and sign on the client. *Id.*, ¶45.

In addition, Mr. Rolle was promoted to the role of Head of Global Inside Sales and was given responsibility for building the inside sales team and the confidential and proprietary scripts, templates, forms and training materials used by the four to five employees on the inside sales team. *Id.*, ¶41. Those materials incorporate key components of the Company's business model and key factors setting the Company apart from their competition in order to garner interest from potential clients. After building the team and developing the team's sales materials, Mr. Rolle supervised the team's outreach campaign which sought to target potential clients and key contacts within potential clients' organizations, which information was procured through business intelligence providers with whom the Company maintains relationships. *Id.*, ¶42

In his role, Mr. Rolle learned all of the key relationships with the Company's major clients and potential clients, and gained knowledge and insight into the strategies that allow the Company to succeed in differentiating itself from competitors. *Id.*, ¶43. While the Company's clients are typically well-known financial institutions, understanding who the key personnel are within the client's architecture and what the clients staffing and training needs are is not well-known. To the contrary, that is information that the Company has developed over time and through the expenditure of significant resources. *Id.*, ¶44.

While the COVID 19 Pandemic caused some business interruption, since putting the new structure in place, the Company has signed has greatly increased its revenue, client base and grown its provision of services to existing clients. *Id.*, ¶46. Moreover, through the help of Wiley and its

12

portfolio of companies, the Alumni during the Covid 19 Pandemic, the Company was able to seamlessly pivot its Alumni Program from an in-person to a virtual model, a process that Mr. Wascak and Mr. Rolle were able to take advantage of in selling the Company's services and establishing relationships with clients. *Id.*, ¶47.

In or around May 2022, MThree was renamed Wiley Edge. *Id.*, ¶48.

**D.  Wascak and Rolle Resign to Unlawfully Compete**

Without warning, Mr. Wascak submitted his letter of resignation on or about June 1, 2022 (Exhibit D to the Seymour Aff.), and Mr. Rolle, subsequently, submitted his letter of resignation on or about June 27, 2022 (Exhibit E to the Seymour Aff.). On June 15, 2022 and June 30, 2022, the Company accepted Wascak and Rolle's resignation and reminded them of their ongoing obligations. *See* Exs. F & G to the Seymour Aff.

Mr. Wascak's letter of resignation recognized the ninety (90) day notice of termination requirement that he agreed to in his employment agreement and, thus, indicated his resignation was effective as of August 31, 2022. *See* Ex. D to the Seymour Aff. Subsequently, however, by email dated July 19, 2022, Mr. Wascak, without any legal or contractual authority to do so, sought to unilaterally shorten his garden leave period and make his resignation effective July 19, 2022. *See* Ex. H to the SeymourAff.

The Company did not accept Mr. Wascak's unilateral attempt to shorten his garden leave period. By email dated July 20, the Company reminded Mr. Wascak that he is on garden leave through August 31 and remains an employee of the Company until that date. *See id.* The Company also again reminded Mr. Wascak of his fiduciary duties and other obligations to the Company, including the restrictive covenants contained in the Wascak Agreement. *Id.* Mr. Wascak remains an employee of the Company to date.

*ACTIVE 681564144v1*

Mr. Rolle's resignation letter recognized the thirty (30) day notice of termination requirement that he agreed to and, thus, Mr. Rolle remained employed by the Company through July 26, 2022.  *See* Ex. E to the Seymour Aff.  Like Mr. Wascak, by email dated July 19, 2022, Mr. Rolle, without any legal or contractual authority to do so, sought to unilaterally shorten his garden leave period and make his resignation effective July 19, 2022 (the same day as Mr. Wascak's). *See* Ex. I to the Seymour Aff.

The Company did not accept Mr. Rolle's unilateral attempt to shorten his garden leave period.  *See id.* By email dated July 20, the Company reminded Mr. Rolle that he is on garden leave through July 26 and remains an employee of the Company until that date. *See id.* The Company also again reminded Mr. Rolle of his fiduciary duties and other obligations to the Company, including the restrictive covenants contained in the Rolle Agreement. *Id.* In response to the Company's July 20 emails to Mr. Wascak and Mr. Rolle, both Mr. Wascak and Mr. Rolle sent identical emails to the Company dated July 22, again attempting to unilaterally shorten their garden leave period. It also appears that both Mr. Wascak and Mr. Rolle even changed their bank accounts so that the Company could not continue to pay them. *See* Exs. H & I to the Seymour Aff.

On or about August 1, 2022, the Company first became aware that Mr. Wascak and Mr. Rolle had formed a company in North Carolina for the express purpose of competing against Wiley Edge in the hire, train, deploy business.  Indeed, they named their new business HTD Talent. Through a July 29, 2022 press release, HTD Talent touted that it was incorporated on July 28, 2022 and, just over a month after Mr. Rolle resigned, had already brought in an initial investment of five million dollars. *See* Ex. N to the Seymour Aff.

By letters dated August 5, 2022, and August 8, 2022 (Exs. J & K to the Seymour Aff.), the Company put Mr. Wascak and Mr. Rolle on written notice that they must comply with their non-

14

compete, non-solicitation, confidentiality and other obligations to the Company, and demanded that Mr. Wascak and Mr. Rolle immediately cease and desist any unlawful activities.

By letter dated August 11, 2022 (Ex. L to the Seymour Aff.), Robert Ottinger, Esq., counsel retained by Mr. Wascak and Mr. Rolle, responded that the Company's cease and desist demand was unwarranted and denied that Mr. Wascak or Mr. Rolle were in breach of their contractual obligations to the Company. Mr. Wascak and Mr. Rolle took the position that the restrictive covenants are unenforceable.

By letter dated August 16, 2022 (Ex. M to the Seymour Aff.), counsel for the Company responded to Mr. Ottinger's August 11 letter, providing Mr. Wascak and Mr. Rolle a final opportunity to confirm by the close of business on August 18, that they will fully comply with their restrictive covenants.  On August 19, Mr. Ottinger emailed the Company's outside counsel acknowledging receipt of the August 16 letter and asked to set up a phone call. On the same day, the Company's outside counsel responded to Mr. Ottinger's email, advising that the Company is prepared to have a discussion on Monday morning regarding how Mr. Wascak and Mr. Rolle intend to comply with their post-employment obligations. Mr. Ottinger then responded, "We can't commit to that."

As a result of performing their job duties at the Company, and as described above, both Mr. Wascak and Mr. Rolle became intimately familiar with – and in many instances, helped create for the Company – confidential, proprietary and trade secret information, including but not limited to: business development plans, information about the Company's clients and prospective clients, price structures, terms of the Company's agreements with its clients, Company's negotiating strategies, and other strategies for competing in the industry.  Seymour Aff., ¶64.  Additionally, using the insight, time and resources of the Company, Mr. Wascak and Mr. Rolle developed key

15

relationships with decision makers within the Company's clients and potential clients. *Id.*, ¶65.

HTD is a direct competitor of the Company and it is clear that Mr. Wascak and Mr. Rolle have created and will be running this company using the confidential, proprietary and trade secret information they obtained while employed at Wiley Edge. *Id.*, ¶66. Mr. Wascak and Mr. Rolle have even made diversity the focus of their company -- which, as Mr. Wascak and Mr. Rolle know, has been a major focus for Wiley Edge. HTD will be competing for the same RFPs as Wiley Edge. *Id.*, ¶67-68.

The enforcement of Mr. Wascak's and Mr. Rolle's restrictive covenants is necessary to prevent key employees like Mr. Wascak and Mr. Rolle from taking and deploying highly confidential and trade secret information, obtained solely by virtue of their employment with the Company, and gaining an unfair advantage. *Id.*, ¶69.

## LEGAL ARGUMENT

### I.     Plaintiff Is Entitled To Injunctive Relief and Temporary Restraints

A party seeking a preliminary injunction must establish "'a threat of irreparable injury and either (1) a probability of success on the merits or (2) sufficiently serious questions going to the merits of the claims to make them a fair ground of litigation, and a balance of hardships tipping decidedly in favor of the moving party.'" *Motorola Credit Corp. v. Uzan*, 322 F.3d 130, 135 (2d Cir. 2003) (quoting *Time Warner Cable v. Bloomberg L.P.*, 118 F.3d 917, 923 (2d Cir. 1997)). The "standards which govern consideration of an application for a temporary restraining order . . . are the same standards as those which govern a preliminary injunction." *Local 1814, Int'l Longshoremen's Ass'n v. N.Y. Shipping Ass'n, Inc.*, 965 F.2d 1224, 1228 (2d Cir. 1992). Plaintiff satisfies all three factors and is entitled to a temporary restraining order and preliminary injunction.

A.     <u>**Injunctive Relief is Necessary to Prevent Immediate and Irreparable Harm**</u>

Plaintiff has shown that the Company will suffer irreparably injury absent the relief requested. "Irreparable harm is defined as certain and imminent harm for which a monetary award does not adequately compensate[,] ... [and] exists where, but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied." *Allstate Ins. Co. v. Harvey Family Chiropractic*, 677 Fed. Appx. 716, 718 (2d Cir. 2017) (quotations and citations omitted); *see also WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275, 285 (2d Cir. 2012) (holding that irreparable harm is "harm to the plaintiff's legal interests that could not be remedied after a final adjudication"). "Harm may be irreparable where the loss is difficult to replace or measure, or where plaintiffs should not be expected to suffer the loss." *WPIX*, 691 F.3d at 285.

The Second Circuit has recognized that "the loss of client relationships and customer goodwill that results from the breach of a non-compete clause generally constitutes irreparable harm." *Mercer Health & Benefits LLC v. DiGregorio*, 307 F. Supp. 3d 326, 347 (S.D.N.Y. 2018). That is because "it would be very difficult to calculate monetary damages that would successfully redress the loss of a relationship with a client that would produce an indeterminate amount of business in years to come." *Ticor*, 173 F.3d at 69. Moreover, irreparable harm has also been found where the defendant possesses confidential trade secrets of the plaintiff, even if there is no evidence that such trade secrets have yet been disclosed, but will inevitably be disclosed. *Payment Alliance Int'l, Inc. v. Ferreira*, 530 F.Supp.2d 477, 480 (S.D.N.Y. 2007); *see also Estee Lauder Cos. v. Batra*, 430 F.Supp.2d 158, 174 (S.D.N.Y. 2006) ("Even where a trade secret has not yet been disclosed, irreparable harm may be found based upon a finding that trade secrets will inevitably be disclosed where, as here, 'the movant competes directly with the prospective employer and the

17

transient employee possesses highly confidential or technical knowledge concerning [] marketing strategies, or the like.'") (citations omitted).

Defendants have made clear that they do not intend on abiding by the Restrictive Covenants. Tellingly, in response to the Company's cease and desist letters, Defendants took the position that the Restrictive Covenants are not enforceable. Defendants' response made clear that neither of them have any intention of complying with their respective agreements and that they intended to continue operating their competing business and plan on soliciting the Company's clients and prospective clients.   To that end, the district court's analysis in *Estee Lauder* is instructive.   In that case, the defendant was hired by Estee Lauder as Global General Brand Manager of the R+F brand and as General Manager for the Darphin brand. In those roles, he was in charge of developing strategies for the brands, was privy to all of the information surrounding the brand's marketing and product development strategies, and had a general idea of the plans for launch of new products. 430 F.Supp.2d at 163. While still employed by Estee Lauder, defendant began discussing an opportunity at Perricone, a direct competitor of Estee Lauder, and, among other things, began creating a strategy for Perricone to begin to grow its business while still employed by Estee Lauder. *Id.* at 164-65.

Estee Lauder filed an order to show cause application seeking temporary restraints. Defendant argued that Estee Lauder has not demonstrated irreparable injury because "(1) Batra does not have any technical expertise; (2) Perricone and Batra do not care about plaintiff's technology as Perricone and Estee Lauder are not competitors, and (3) Batra has eliminated any risk of misappropriation of trade secrets by stipulation that he will be completely divorced from new product development in his position at Perricone." *Id.* at 175. The court rejected each of defendant's arguments. The court found that Batra possesses trade secrets, as "it is conceded that

18

he was responsible for developing the R+F brad strategies . . . and was intimately involved in developing the Darphin brand strategies," and that he had "confidential information about the stage of development of products in the pipeline, wholly apart from specific secrets concerning its process, which is entitled to protection." *Id.* at 176. As for Batra's second argument, "an individual's assertion that he 'really doesn't care' about his former employer's trade secrets is not sufficient to overcome a demonstration of irreparable harm," and "Estee Lauder should not be required to rely on Batra's characterization of the usefulness of the information he obtained while employed there." *Id.* at 176. The court further rejected Batra's last argument, noting that "Batra has not proven the most trustworthy in the fulfillment of his obligations owed to Estee Lauder." *Id.* (citing *PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1270 (7th Cir. 1995) (holding the risk of inevitable disclosure further supported by the former employee's 'lack of forthrightness' and 'out and out lies').

Here, as in *Estee Lauder*, Plaintiff has demonstrated that Defendants have already made use, and intend to continue making use, of the Company's confidential and proprietary information and trade secrets, in direct violation of their respective Agreements. Defendants have formed HTD Talent, a direct competitor of Wiley Edge, and it is clear that Mr. Wascak and Mr. Rolle have relied upon and will continue to rely upon confidential, proprietary and trade secret information they obtained while employed at Wiley Edge.  Moreover, Mr. Wascak and Mr. Rolle created their competing business, including obtaining a significant initial investment, all while still under the employ of Wiley Edge. Mr. Wascak and Mr. Rolle have even made diversity the focus of their company --  which, as Mr. Wascak and Mr. Rolle know, has been a major focus for Wiley Edge.

As a result of performing their job duties at the Company, and as described above, both Mr. Wascak and Mr. Rolle became intimately familiar with – and in many instances, helped create

19

for the Company – confidential, proprietary and trade secret information, including but not limited to: global strategies for the recruitment of diverse talent, business development plans, information about the Company's clients and prospective clients, price structures, terms of the Company's agreements with its clients, Company's negotiating strategies, and other strategies for competing in the industry.[1] Defendants should not be allowed to violate the terms of the Restrictive Covenants to which they agreed, at the expense of the Company. *See also Ferreira*, 530 F.Supp.2d at 482-83 (finding defendant's "employment with Cynergy creates the risk that disclosure of PAI's trade secrets is inevitable. Here, it is undisputed that Ferreira left PAI to work for a direct competitor. It is also undisputed that Ferreira's employment at Cynergy will be in a similar capacity. Thus, even if Ferreira acted with the best of intentions, 'he may unintentionally transmit information gained through his association with [PAI] during his day to day contact' with his new employer. . . . the confidential information in Ferreira's possession about PAI's customers and marketing strategies would undeniably be of value to one of its direct competitors.").

Additionally, using the insight, time and resources of the Company, Mr. Wascak and Mr. Rolle developed key relationships with decision makers within the Company's clients and potential clients, and gained knowledge and insight into the strategies that allow the Company to succeed in differentiating itself from competitors to win hot leads and new business. While the Company's clients are typically well-known financial institutions, understanding who the key personnel are within the client's architecture and what the clients staffing and training needs are is not well-known.  To the contrary, that is information that the Company has developed over time and through the expenditure of significant resources. Defendants' actions in forming a direct

---

[1] As set forth in Section B(1)(b) *supra*, such information constitutes trade secrets and are entitled to protection under New York law.

20

competitor of Wiley Edge "threaten to cause [the Company] irreparable harm by luring away the business of a number of [the Company's] clients." *Johnson Controls, Inc. v. A.P.T. Critical Sys.*, 323 F.Supp.2d 525 (S.D.N.Y. 2004) (noting that in defendants' respective positions at plaintiff employer, defendants "were placed in positions that enabled them to maintain and develop significant and unique relationships with JCI's customers. . . . Furthermore, to the extent the purpose behind the non-compete clauses is to allow JCI a brief period to transfer the client relationships maintained through Neville and Moon to their replacements, that benefit is inexorably lost by the failure to enforce the clauses immediately. What is at stake, then, for JCI is not only the indeterminate future billings that these clients would generate, but also the significant good will built up during JCI's *and* APT's long-term service of these clients.").

Accordingly, Plaintiff has sufficiently established immediate and irreparable harm in the absence of an injunction here. *See e.g.*, *Adecco USA*, 2020 U.S. Dist. LEXIS 226382, at *10 ("there remains an indeterminate amount of damages for the loss of client relationships that would produce profits for an indeterminate amount of time beyond the restricted period for which damages could not be ascertained with any degree of certainty" and therefore plaintiffs successfully demonstrated irreparable injury warranting preliminary injunction relief); *Veramark Techs. Inc. v. Bouk*, 10 F.Supp.3d 395, 400 (W.D.N.Y. 2014) ("Because it is very difficult to calculate money damages in the event of the loss of a client relationship 'that would produce an indeterminate amount of business in years to come,' the violation of an enforceable non-compete constitutes irreparable harm").

Moreover, Defendants expressly acknowledged that "a remedy at law for any breach or threatened breach of this Agreement would be inadequate, and therefore, agree that MThree or its Affiliates shall be entitled to injunctive relief, without posting bond or other security[.]"

21

Agreements at Section D.1. "You further agree that if suit is successfully brought to enforce this Agreement or to seek damages for its breach or threatened breach, you will pay to MThree or its Affiliates, in addition to any other damages caused to MThree or its Affiliates, all attorneys' fees incurred by MThree or its Affiliates in seeking such relief." *Id.* Such language is "one factor that must be considered in deciding whether irreparable harm would result if an injunction did not issue." *Markovits v. Venture Info Capital, Inc.*, 129 F.Supp.2d 647, 661 (S.D.N.Y. 2001); *see also Digregorio*, 307 F.Supp.3d at 348 ("In the Second Circuit, such contractual provisions, while not dispositive, support a finding of irreparable harm.") (citing cases); *Deutsche Mex. Holdings S.a.r.l. v. Accendo Banco, S.A.*, 2019 U.S. Dist. LEXIS 180275, at *20 (S.D.N.Y. Oct. 17, 2019); *Adecco USA, Inc. v. Staffworks, Inc.*, 2020 U.S. Dist. LEXIS 226382, at *8-9 (N.D.N.Y. Sept. 15, 2020) ("the Second Circuit has suggested that a provision in an employment contract which concedes that in the event of breach, the non-breaching party will be irreparably harmed, might constitute an admission that the plaintiff has suffered irreparable harm."). Accordingly, Plaintiff has met its burden to establish immediate and irreparable harm in the absence of injunctive relief.

      **B.**    **Plaintiff is Likely to Prevail on Its Claims**

        **1.**    **Plaintiff Will Succeed on its Breach of Contract Claim Because The Restrictive Covenants are Enforceable**

Under New York law, "[t]he issue of whether a restrictive covenant not to compete is enforceable by way of an injunction depends in the first place upon whether the covenant is reasonable in time and geographic area." *Willis*, 550 F. Supp. 3d at 102 (quoting *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 69 (2d Cir. 1999)). "In determining whether a restrictive covenant is reasonable, courts must balance the employer's legitimate business concerns with New York's strong public policy against causing a person to lose the ability to earn a livelihood." *Id.* (quoting *DiGregorio*, 307 F. Supp. 3d at 349). "A restraint is reasonable only if it: (1) is *no greater* than is

22

required for the protection of the *legitimate interest* of the employer, (2) does not impose undue

hardship on the employee, and (3) is not injurious to the public." *Id.* (quoting *BDO Seidman v.*

*Hirshberg*, 93 N.Y.2d 382, 388-89, 712 N.E.2d 1220, 690 N.Y.S.2d 854 (1999)) (emphasis in

original).

        a.       **The Restrictive Covenants Are Reasonable as to Time and Geographical Scope[2]**

        The non-compete provision prohibits Defendants from working with the Company's

competitors for a period of six months, and the non-solicit provision prohibits Defendants from

directly or indirectly contacting the Company's employees, customers or prospective customers

for a period of twelve months following the expiration of their employment with the Company.

New York Courts have routinely found restrictive covenants that are a year or less to be "well

within the prevailing notions of reasonableness." *Integra Optics, Inc. v. Messina*, 52 Misc.3d

1210(A), 41 N.Y.S.3d 719 (2016). *See also Goodman v. New York Oncology Hematology, P.C.*,

101 A.D.3d 1524, 1526-27 (3d Dep't 2012) (covenant not to compete for one year found to be

reasonable); *Washington Square Institute for Psychotherapy and Mental Health, Inc. v. Speciner*,

259 A.D.2d 368, 369 (1st Dep't 1999) ("The restrictive covenant in issue, which merely prohibits

defendant from treating patients introduced to her by plaintiff for a period of one year after

termination of her employment, is reasonable as to time and location"); *Evolution Markets, Inc. v.*

---

[2] Even if the Court finds the Restrictive Covenants overbroad as to time and/or scope (which they are not), partial enforcement would still be warranted.  *See e.g. Unisource Worldwide, Inc. v. Valenti*, 196 F.Supp.2d 269, (E.D.N.Y. 2002) ("If a court finds a limitation to be unreasonable, it can 'blue pencil' the covenant to restrict the term to a reasonable geographic limitation, and grant partial enforcement for the overly broad restrictive covenant."); *see also* Agreements at Section D.5 (titled "Blue Pencilling and Severability" and noting that "if any covenant or provision is held to be unenforceable because of the scope, duration or area of its applicability, the court or tribunal making such determination shall have the power to modify such scope, duration or area, or all of them, and such covenant or provision shall then be applicable in such modified form and every other provision of this Agreement shall remain in full force and effect.").

*Penny*, 23 Misc.3d 1131, 889 N.YS.2d 882 (2009) (finding time restrictions of six months for the non-compete, nine months for the no-solicitation, and 14 months for the no-hire "reasonable and no greater than required to protect EvoMarkets' legitimate business interest."); *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63 (2d Cir. 1999) ("the reasonableness test was met because the duration of the covenant was relatively short (six months)"); *Silipos, Inc. v. Bickel*, 2006 WL 2265055 (S.D.N.Y. Aug. 8, 2006) ("New York courts routinely find one-year restrictions to be reasonable. *See, e.g., Crown It Servs., Inc. v. Koval-Olsen*, 782 N.Y.S.2d 708, 710 (N.Y. App. Div. 2004) (finding 'no serious dispute' that a one-year limitation is reasonable)."). Accordingly, the six-month duration for the non-compete period and the one-year duration for the non-solicitation period are *per se* reasonable under New York law.

The geographic scope of the non-compete is also reasonable. Where, like here, the business at issue is international in scope, New York Courts have regularly enforced restrictive covenants with no geographic limitations. *See e.g. Evolution Markets,* 889 N.YS.2d 882 ("the lack of a geographic restriction is necessary given that Plaintiff's customers are from all over the world and the brokerage business is largely conducted over the telephone. . . . As such, 'any geographic limitation on the covenant's scope would obviate its usefulness to EvoMarkets.'"); *MasterCard International Inc. v. Nike Inc.*, 164 F.Supp.3d 592 (S.D.N.Y. 2016) (same)*; Messina*, 41 N.Y.S.3d 719 ("the absence of a geographic limitation seems reasonable under the facts and circumstances of this case, including: (a) the narrow and well-defined market in which Integra operates; (b) the worldwide scope of the market; (c) the nature of Messina's sales and marketing activities, which are conducted largely by email and telephone; and (d) the relatively brief duration of the covenant."). It would be perfectly reasonable to enforce a non-compete with no geographic limitations against the Defendants. The non-compete provisions to which Defendants are bound,

24

however, only restrict them from competing with Wiley Edge in the New York Metropolitan Area or within 50 miles therefrom.

Finally, while the non-solicitation provision does not contain a geographical scope, the provision is nevertheless reasonable and enforceable because the limitation applies only to "clients or customers you originated or serviced during your employment with MThree, or about whom you are aware of Confidential Information, but only where MThree continues to provide services in the geographical area where such client or customer does business. This restriction is meant to protect the Company from losing such clients or customers to you, who by virtue of your employment with MThree, maintained a relationship with the clients and customers, gained knowledge about them, and/or became familiar with the requirements of such clients and customers."[3] Accordingly, the non-solicitation provision is reasonable in scope. *Evolution Mkts., Inc.*, 2009 N.Y. Misc. LEXIS 1276, at *45; *Marsh USA Inc. v. Karasaki*, 2008 U.S. Dist. LEXIS 90986, at *48 (S.DN.Y. Oct. 31, 2008) ("New York state courts have upheld non-solicitation agreements imposing client-based restrictions without geographic limitation as reasonable in scope.") (citing cases).

        **b.**      **The Restrictive Covenants Are Required to Protect the Company's Legitimate Interests**

Under New York law, one legitimate interest of the employer "'is protection of customer relationships the employee acquired in the course of employment,' because 'when the employee must work closely with the client or customer over a long period of time, then the employee has been enabled to share in the goodwill of a client or customer which the employer's over-all efforts

---

[3] In response to the Company's cease and desist letters, Defendants did not object to the non-solicitation of the Company's employees or former employees. The Company reserves its rights to seek to enforce the non-solicit with respect to employees or former employees, in the event the Company learns that either Defendant is in violation of said provision.

and expenditures created.'" *Willis*, 550 F.Supp.3d at 103 (quoting *Kelley-Hilton v. Sterling Infosystems Inc.*, 426 F. Supp. 3d 49, 57 (S.D.N.Y. 2019)); *see also Marsh USA Inc.*, 2008 U.S. Dist. LEXIS 90986, at *49 ("it is now clear that under New York law an employer also has a legitimate interest in protecting client relationships developed by an employee at the employer's expense.")).

Further, "even where there is no showing that a former employee has obtained a competitive advantage through the misappropriation of confidential customer information, or that the employee provided unique or extraordinary services, the employer retains 'a legitimate interest in preventing former employees from exploiting the goodwill of a client or customer, which had been created and maintained at the employer's expense, to the employer's competitive detriment.'" *Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*, 813 F.Supp.2d 489, 510 (S.D.N.Y. 2011) (quoting *BDO Seidman*, 93 N.Y.2d at 392). In *Ecolab, Inc. v. K.P. Laundry Machinery, Inc.*, 656 F.Supp. 894, 899 (S.D.N.Y. 1987), the District Court discussed:

> the goodwill of the salesman's relationship with the customer is to a degree an asset of the employer. In many instances the goodwill has been created by the employer and is passed on to the salesman by introductions and support. If it is developed by the salesman, that is done for the benefit of the employer under a duty of loyalty and in return for compensation paid to the salesman by the employer. These aspects of goodwill can be reasonably viewed as legitimate property interests of the employer which are entitled to contractual protection so long as the protective contracts are of reasonable scope.

New York courts have also acknowledged that an employer has a legitimate interest in its confidential and proprietary trade secrets. A trade secret is "any formula, pattern, device or compilation of information which is used in one's business and which gives [the owner] an opportunity to obtain an advantage over competitors who do not know or use it." *Softel, Inc. v. Dragon Med. & Scientific Commc'ns, Inc.*, 118 F.3d 955, 968 (2d Cir. 1997). "New York courts consider several factors in determining whether information constitutes a trade secret, including:

26

(1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others." *Estee Lauder Cos.*, 430 F.Supp.2d at 175 (citing *N. Atlantic Instruments, Inc. v. Haber*, 188 F.3d 38, 44 (2d Cir. 1999)). "In determining whether something has trade secret status, 'the most important consideration is whether the information was secret.'" *Id.*

In this case, the Company has legitimate interests in the protection of customer relationships that Defendants acquired in the course of their employment, as well as the protection of the confidential and proprietary information and trade secrets that Defendants had access to during the course of their employment. As the head of global business development, Mr. Wascak was intimately familiar with all of the Company's confidential sales training materials, had visibility and direct input on the Company's entire pricing strategy and has intimate knowledge on how the Company successfully positioned itself to win RFPs from a financial and market differentiation perspective.  Mr. Wascak also has direct knowledge about how much the Company pays each of its employees globally, and thus, he would know how to undercut the Company when competing for an RFP or client pitch. Mr. Wascak was also directly involved in the negotiation of a Master Service Agreement ("MSA") with potential clients, and he was often the one driving the terms of the agreements.  Mr. Wascak made relationships with the key decision makers within the clients and the clients' legal team and would liaise with the Company's own legal team on contract negotiation and other issues. As such, Mr. Wascak has intimate knowledge about how the Company structures and negotiates its MSAs.

27

Most significantly, Mr. Wascak was directly involved in crafting and creating the curriculum and heavily influenced how it was developed.  Specifically, he worked closely with the subject matter experts (i.e., individuals who actually know what particular skills are needed for the particular job), liaised with the client to understand the client's specific needs, and would then relay this information to those at the Company responsible for crafting the curriculum for a particular client. The curriculum for each client is the product of years of effort and significant expense and constitutes confidential trade secret information.  Like other Company trade secrets, the curriculum is maintained in a secure environment and access is limited to only Company employees that need it.  Even the Company clients are not privy to the actual curriculum nor how it is created and, while Alumni are trained using the curriculum, they do not get a copy and are only provided access to the training modules after executing a Confidentiality Agreement. The aforementioned information is not generally known to the public and is entitled to protection. *See e.g.*, *Estee Lauder Cos.*, 430 F.Supp.2d at 175.

Similarly, as the Head of Global Inside Sales, Mr. Rolle was responsible for building the inside sales team and the confidential and proprietary scripts, templates, forms and training materials used by the four to five employees on the inside sales team.  Those materials incorporate key components of the Company's business model and key factors setting the Company apart from their competition in order to garner interest from potential clients. After building the team and developing the team's sales materials, Mr. Rolle supervised the team's outreach campaign which sought to target potential clients and key contacts within potential clients' organizations, which information was procured through business intelligence providers with whom the Company maintains relationships. In his role, Mr. Rolle learned all of the key relationships with the Company's major clients and potential clients, and gained knowledge and insight into the

*ACTIVE 681564144v1*

strategies that allow the Company to succeed in differentiating itself from competitors. While the Company's clients are typically well-known financial institutions, understanding who the key personnel are within the client's architecture and what the clients staffing and training needs are is not well-known.  To the contrary, that is information that the Company has developed over time and through the expenditure of significant resources.

Finally, and notably, by signing the Wascak and Rolle Agreements, Defendants expressly acknowledged that "the covenants contained in Section C of this Agreement are reasonably necessary to protect valuable business interests of the Company, the Company's business, its officers, directors and employees."  Agreement, Paragraph 4. Accordingly, the Company has "made a strong showing that the covenants are 'necessary to protect the trade secrets, customers lists [and] goodwill of [the Company's] business,' and that they are reasonable 'in time, space [and] scope.'"  *Ecolab*, 656 F.Supp. at 899 (internal citations omitted); *see also Willis*, 550 F.Supp.3d at 103 (finding the restrictive covenants enforceable where they protect plaintiff's "'legitimate interest in protecting client relationships developed by' [defendant] at the company's expense; they are client-specific and therefore "reasonable in geographic scope, notwithstanding the broad definition of 'Relevant Area' in the [restrictive covenants]").

### c.     The Restrictive Covenants Do Not Impose An Undue Hardship On Defendants

The Restrictive Covenants do not impose an undue hardship on Defendants and in no way eliminate either Mr. Wascak's or Mr. Rolle's ability to earn a living. "New York courts have routinely found that an individual does not suffer undue hardship where a restrictive covenant merely prohibits him from soliciting his former employer's clients for a reasonably defined period of time." *Digregorio*, 307 F.Supp.3d at 351.

29

The non-solicitation provisions seek only to prevent Mr. Wascak and Mr. Rolle from poaching Wiley Edge's existing clients or prospective clients that were generated through the efforts of Mr. Wascak and Mr. Rolle using the Company's time and resources, for a period of one year following their termination, and the non-compete seeks only to prevent Defendants from competing with the Company, for a period of six months in a limited geographic area following their termination. Significantly, Mr. Wascak's and Mr. Rolle's employment agreements provide that the Company would continue to pay Defendants' base salary for 90 days following written notice of the termination of their employment with the Company. *See* Agreement at Paragraph 11. Plaintiff has therefore sufficiently satisfied this factor, and the Restrictive Covenants are reasonable and enforceable. *See Uni-World Capital L.P. v. Preferred Fragrance, Inc.*, 73 F.Supp.3d 209, 237 (S.D.N.Y. 2014) ("The injunction that plaintiffs seek would merely bar Ezriel from violating his non-compete agreements. It would not impose any new legal duty on him; instead it would give necessary teeth to an existing contractual duty. Plaintiffs, by contrast, would suffer a substantial hardship if their request were denied, because Ezriel would be likely to continue his breach of the non-compete."); *Ecolab, Inc.*, 656 F.Supp. at 898 ("There is little danger that enforcement of the Ecolab employment agreement will interfere with the former employees' ability to earn a livelihood . . . Barring these employees for one year from soliciting the handful of clients they serviced while at Ecolab would not be an unreasonable hardship."); *Marsh USA*, 2008 U.S. Dist. LEXIS 90986, at *54 ("Considering the wide array of other accounts that are still available to Karasaki under the agreements, and the fact that the non-solicitation provision only applies for one year, Marsh is likely to prevail on its showing that the agreements do not impose an undue hardship on Karasaki.").

       **d.**    **The Restrictive Covenants Are Not Against The Public Interest**

30

The enforcement of the Restrictive Covenants here will not harm the public. "If anything, the public interest would be advanced by such an injunction, because, on the facts here, such an injunction would tend to encourage parties to abide by their agreements." *Digregorio*, 307 F.Supp.3d at 351 (quoting *Uni-World Capital L.P. v. Preferred Fragrance, Inc.*, 73 F.Supp.3d 209, 237 (S.D.N.Y. 2014)). "[E]nforcement of the restrictive covenants through an injunction would not be injurious to the public since, among other things, [Defendants] may, even now, pursue any client other than" Wiley Edge's existing clients or prospective clients that were generated through the efforts of Mr. Wascak and Mr. Rolle using the Company's time and resources. *Willis*, 550 F.Supp.3d at 104.

### e.     Defendants Breached the Enforceable Restrictive Covenants

Having determined that the Restrictive Covenants are valid and enforceable, there can be no question that Defendants have violated same.  With incredible audacity, while still employed by the Company, Defendants have established a business to directly compete with the Company.  It is clear from Defendants' new website that they are already using marketing strategies employed by the Company, which strategies they were directly involved in creating while at the Company.  And, when confronted by the Company to ensure they would comply with their restrictive covenants, Defendants disavowed any obligations they had under same, taking the position that the covenants were not enforceable.  Wiley Edge does not need to wait for Defendants to act on their clear repudiation of their post-employment restrictions, as Defendants have already demonstrated an intent to violate same, including through breaching their fiduciary obligations to the Company by establishing a competing business, based on the Company's very-own strategy, before their employment with the Company ended.  Accordingly, Plaintiff is likely to succeed on the merits of its breach of contract claim against Mr. Wascak and Mr. Rolle.

31

C.    **The Balance of Hardships Favor a Temporary Restraining Order and Injunction**

As set forth in Section I.A, *infra*, the Company will suffer immediate and irreparable harm in the absence of the requested injunctive relief.  On the other hand, the harm, if any, to Defendants if the Court issues a preliminary injunction is no more than what the parties anticipated.  Pursuant to the Wascak and Rolle Agreements, Defendants were aware of and expressly agreed to be bound by the Restrictive Covenants following termination of their employment with the Company.  Moreover, pursuant to the Wascak and Rolle Agreements, Defendants expressly agreed that their "experience, capabilities and circumstances are such that these provisions will not prevent you from earning a livelihood. You further agree that you have received valuable and adequate compensation in exchange for entering into the restrictions set out in this Agreement." Agreements at Paragraph 4.  Therefore, the final factor weighs in favor of a preliminary injunction. *See e.g.*, *Uni-World Capital*, 73 F.Supp.3d at 237; *Ecolab, Inc.*, 656 F.Supp. at 898; *Marsh USA*, 2008 U.S. Dist. LEXIS 90986, at *54.

## CONCLUSION

For the reasons described above, Plaintiff respectfully urges the Court to issue a temporary restraining order to enjoin defendants from

Dated: August 22, 2022

Respectfully submitted,

**GREENBERG TRAURIG, LLP**

*s/ Jason H. Kislin*

Jason H. Kislin
kislinj@gtlaw.com
One Vanderbilt Avenue
New York, NY 10017
212.801.9200
212.801.6400 - Fax
*Attorneys for Plaintiff*